## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ASIF WILLIAM RAHMAN,<br><br>　　　　　　　　　*Defendant*. | Case No. 1:24-cr-249 (PTG) |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Asif William Rahman respectfully submits this memorandum in advance of his sentencing, scheduled for May 13, 2025, to assist the Court in determining a punishment that is sufficient but not greater than necessary to meet the objectives of 18 U.S.C. § 3553(a). For the reasons set forth below, including his extraordinary, early, and full cooperation, his genuine remorse, and the mitigating circumstances giving rise to his offense, Mr. Rahman respectfully requests a sentence significantly below the advisory Guidelines range.

## I.    INTRODUCTION

Asif Rahman stands before the Court accepting full responsibility for his offenses. Mr. Rahman does not seek to minimize the seriousness of his conduct, which constituted a breach of the trust placed in him by his employer and his colleagues in the Intelligence Community. His prompt plea, and his immediate and extraordinary cooperation with the government, coupled with his sincere and proactive efforts to assist the government in preventing future breaches and mitigating the damage caused by his own, distinguishes his case. Moreover, the personal circumstances giving rise to his offense are atypical, and serve to explain how an officer with such

1

tremendous promise and achievement could so dramatically fail himself and those who depended upon him.

Mr. Rahman has expressed deep and sincere remorse for his actions. His contrition is directed not only toward the U.S. government and his former colleagues at home and abroad, but also—and most painfully—toward his family. His wife and family have afforded him enduring support and opportunity for success, and he recognizes the harm his offenses have caused them. Mr. Rahman's acknowledgment of the gravity of his offense is genuine and ongoing, reflected in his willingness to accept the consequences of his actions by relieving the U.S. government of the substantial burden of placing national security information at issue in a trial, and working tirelessly to limit any potential damage that might have resulted from his actions.

Mr. Rahman's offense was an aberration in his otherwise unblemished life and a significant deviation from his lifelong dedication to his country, his job, and his family. We ask the Court to review the voluminous letters that Mr. Rahman's family and friends have submitted on his behalf to understand the full picture of who he is.

We respectfully submit that this constellation of factors warrants substantial mitigation at sentencing. As set forth in detail below, Mr. Rahman respectfully submits that a sentence of no greater than 13 months' imprisonment would impose a sufficient, fair, and just penalty for his offense.

## II.    EXTRAORDINARY COOPERATION

From the earliest days of this case, Mr. Rahman accepted responsibility and offered fulsome, candid, and critical cooperation to the FBI and U.S. Intelligence Community agencies. He began cooperating with prosecutors within ten days of his arrival in the District, and entered an extraordinarily early plea just six weeks after his initial hearing. This accelerated timeline is

significant, because prosecutions involving classified information—even those resolved by plea agreements—typically take many months, if not years, to resolve, and require the government to go to great lengths to protect classified information from discovery and disclosure. Mr. Rahman's cooperation relieved the government of this time-consuming and burdensome process; he promptly provided detailed, time-sensitive information regarding the broader circumstances of his offense to permit the government to take swift action to understand and mitigate any possible harm and to take steps to bolster U.S. national security interests going forward.

As discussed in the declaration submitted by William McCausland, former FBI supervisory special agent and CIA Chief of Counterespionage, which will be filed under seal, Mr. Rahman's cooperation bore all the hallmarks of the successful provision of substantial assistance to the government in the national security context. *See* Exhibit D. His cooperation included:

- Detailed Disclosure of Critical Information: Soon after his arrest in November 2024—and prior to receiving classified discovery or any plea offer—Mr. Rahman furnished highly detailed, complete, and timely accounts of his own actions and those of others, allowing investigators to reconstruct events and assess the full scope of the breach. Mr. Rahman offered his cooperation to the government within days of his first appearance in the Eastern District of Virginia. He was arraigned before this Court on December 11, 2024, and began providing key information to the government on Saturday, December 14, 2024. By December 26, 2024, he had voluntarily offered the passwords to his encrypted electronic devices—all in advance of the protection of any cooperation agreement or proffer letter. He began meeting with prosecutors and agents in person as of December 31, 2024, and, from the outset, Mr. Rahman has been entirely forthcoming with the government by providing comprehensive information about his disclosures. His plea encompassed

information that he provided during this cooperation, before the defense had complete discovery. In fact, much of the information about Mr. Rahman's offenses in the Statement of Facts, specifically Paragraphs 8, 9, 10, 11, 13, 14, 15, 17, 18, and 19, contains details about Mr. Rahman's actions that the government learned from him and through his cooperation. *See* ECF No. 58.

- Assistance in Further Investigation: Mr. Rahman's information, which included a scrupulous accounting of all issues that could potentially be relevant to the government (such as the precise means of communications and methods of disclosure), materially advanced U.S. government efforts to identify and investigate additional actors and security vulnerabilities, as described in more detail in the McCausland declaration. Even prior to his first formal debriefing with prosecutors on December 31, 2024, Mr. Rahman had provided the passwords to all encrypted devices in the possession of the FBI, which allowed the FBI to conduct a full forensic examination. Notably, within days of his initial appearance before the Court, he pointed the FBI directly to perishable information on a device that, based on the search warrant return, may not have been in the immediate possession of the government, but which he believed could assist the U.S. government in its investigation.

- Counterintelligence Support: As set forth in detail in the McCausland declaration, Mr. Rahman also provided unique insight into the confluence of personal and professional pressures that led to his misconduct, as well as various Intelligence Community policies and practices that failed to recognize system vulnerabilities or otherwise forestall his actions. Mr. Rahman has debriefed with representatives of the Intelligence Community during full day sessions on March 12, 18, and 19, 2025, in which he described his activities

in detail, answered <u>all</u> of their questions to the best of his ability, and offered to assist with any follow-up inquiries, including reconstruction of events to resolve unknowns. He was asked if he would be willing to take a polygraph examination and immediately consented to doing so. His perspective and explanations have surely been instrumental in helping the Intelligence Community develop improved insider threat detection and prevention strategies, and will be valuable to the Department of Justice going forward. Mr. Rahman will uphold his promise to continue assisting the U.S. government in its efforts to prevent future unlawful retentions and transfers of classified materials.

Mr. McCausland also described how this assistance has furthered the government's ability to advance its national security interests. Mr. McCausland's career as an FBI agent handling criminal and national security cases, which culminated in his serving as CIA's Chief Counterespionage official, uniquely qualifies him to understand and explain the value of cooperation in these matters. As his declaration describes, the timing and fulsomeness of Mr. Rahman's cooperation combined to provide extremely valuable information and intelligence to the government.

In sum, Mr. Rahman's cooperation has been extraordinary, far exceeding that typically seen in similar national security prosecutions, which historically have involved minimal, if any, cooperation from defendants. <u>Mr. Rahman's swift cooperation demonstrates his profound regret for his actions, his full acceptance of responsibility, his sincere desire to mitigate any potential damage caused by his disclosures, and his commitment to the Court and to the government that he would never reoffend</u>. Mr. Rahman's conduct represents the type of immediate, full, and meaningful assistance that the Department of Justice and the courts should encourage.

### III.    SENTENCING CONSIDERATIONS

Under 18 U.S.C. § 3553(a), the Court must impose a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing. In light of Mr. Rahman's extraordinary cooperation, his genuine remorse, his assistance in protecting national security, and the mitigating circumstances giving rise to conduct that was a stark aberration from his personal character and professional history, a substantial downward departure and/or variance is warranted.

Courts have consistently recognized that significant cooperation is an important factor that can and should warrant similarly significant reductions from the advisory range. *See, e.g.*, *United States v. Vinson*, 852 F.3d 333, 358 (4th Cir. 2017); *United States v. Neal*, 805 F.2d 393, at *3 (4th Cir. 1986) (unpublished table decision) ("A willingness to cooperate in criminal investigations in order to expose illegal activities, coupled with actual cooperation, is commendable, and is an indication that an offender has on his own accord started the rehabilitation process. Such cooperation may be considered in sentencing decisions and appropriately rewarded."). Mr. Rahman's cooperation, as detailed above, represents a model of post-offense behavior that should be encouraged in the interests of justice and national security.

For these reasons and as set forth in detail below and under seal, Mr. Rahman respectfully submits that a sentence of no greater than 13 months of imprisonment, followed by one year of supervised release, is a sufficient but not greater than necessary penalty for his offense.

### A.    APPLICABLE ADVISORY GUIDELINES RANGE

On January 17, 2025, Mr. Rahman pled guilty to a two-count indictment charging him with willful retention and transmission of national defense information, in violation of 18 U.S.C. § 793(e). Under the terms of the plea agreement, Mr. Rahman and the government have agreed to a stipulated United States Sentencing Guidelines ("U.S.S.G.") offense level of 26, calculated from a base offense level of 29 under U.S.S.G. § 2M3.3(a)(1), a two-level enhancement for abuse of a

position of trust, *see id.* § 3B1.3, a three-level decrease for acceptance of responsibility, *see id.* § 3E1.1, and a further two-level "zero-point offender" decrease pursuant to U.S.S.G. § 4C1.1(a). ECF No. 57 at 3–4; *see United States v. Aquino*, 555 F.3d 124, 130–31 (3d Cir. 2009) (holding that U.S.S.G. § 2M3.3 is applicable where, as here, the defendant is convicted of willful retention and transmission of tangible information). With Mr. Rahman's lack of criminal history, this offense level results in an advisory sentencing Guidelines range of 63 months to 78 months of imprisonment and an estimated applicable fine range of $25,000 to $250,000. The Presentence Investigation Report's (PSR") Guidelines calculation and advisory sentencing range are consistent with the parties' recommendation. PSR ¶¶ 50–62, 90–91.

### B.    DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. § 5K1.1

Mr. Rahman agrees with the government that a downward departure from the Guidelines range pursuant to U.S.S.G. § 5K1.1 is warranted based on his substantial assistance in the government's investigation of his offense. As described above, Mr. Rahman has provided extraordinary and meaningful assistance to the government's investigation of the disclosure of classified information. Three days after his arraignment, Mr. Rahman offered his cooperation to the government. Since then, Mr. Rahman has been forthcoming and truthful. He has provided the government with information that it was not aware of previously, which enabled the government to comprehend the scope of his conduct quickly and without expending significant resources. Since pleading guilty, Mr. Rahman has continued to provide assistance to the government in strengthening its insider threat program. For these reasons, Mr. Rahman respectfully requests that the Court grant the government's motion for a downward departure pursuant to U.S.S.G. § 5K1.1 and depart substantially from the advisory Guidelines range. We are recommending a sentence consistent with a departure that would be the equivalent of cutting the applicable advisory

Guidelines offense level of 26 points in half, to 13 points, which would result in an advisory Guidelines range of 12 to 18 months. Our recommendation of 13 months is within that range.

### C.     APPLICATION OF 18 U.S.C. § 3553(a) FACTORS

1.     <u>History and Characteristics of Mr. Rahman</u>

a.     Personal History and Character

Mr. Rahman's extraordinary history and characteristics independently support a term of 13 months' imprisonment as a sufficient punishment to serve the goals of sentencing. Mr. Rahman has no prior criminal history whatsoever, and his life has been defined by truly extraordinary achievement, service to society, and commitment to family. Returning Mr. Rahman to his family and community after he has served an appropriate sentence would benefit both Mr. Rahman and those around him.

Mr. Rahman was born in California in 1990. His father, Muhit, immigrated to the United States from Bangladesh in 1975 and became a naturalized citizen in 1986. Mr. Rahman was raised by his father and mother, Annie, along with his two younger sisters, in a stable, supportive, and nurturing home environment. The family has always been and remains close-knit.

Mr. Rahman's parents instilled in him values that shaped him into a bright and hardworking individual. From a young age, Mr. Rahman applied himself fully in his academic and professional pursuits, making the most of the resources available to him. Mr. Rahman was valedictorian of his high school class. In 2012, he graduated from Yale University, where he excelled in the study of economics, graduating magna cum laude in only three years. From 2012 to 2014, Mr. Rahman worked as an analyst at Morgan Stanley in New York. Mr. Rahman then attended the University of Chicago Booth School of Business, where he earned his Master of Business Administration in 2016.

In 2017, Mr. Rahman married his wife, Deandra, whom he had met at Yale. Until June 2024, Mr. Rahman and his wife lived together in northern Virginia, and although Mr. Rahman spent periods of time overseas while working for the CIA, he and his wife remained close and supportive of each other. Mr. Rahman has also been an active member of his community. Mr. Rahman and Deandra are particularly involved in the local chapter of the Association of Asian American Yale Alumni, a volunteer organization dedicated to promoting the civic participation, leadership, and service of Asian Americans and Asians at Yale and in broader society.

Because of his work ethic, intellect, maturity, integrity, and devotion to his family, Mr. Rahman lived a model life up until his offense. The letters submitted on his behalf by family and friends explain why Mr. Rahman is beloved. *See* Exhibit B. He is extremely gifted, yet modest and unassuming. The letters are from family members and friends who have known him through different relationships and from different periods of his life, but paint a very consistent picture of his character. These people consistently describe Mr. Rahman as kind, thoughtful, and compassionate. Despite his indisputable talents and academic success, he is known for his humility and modesty. Family and friends describe him as playful and warm with those who know him best. He cares deeply for his family, and they have responded by providing their full and extraordinary support for him through his arrest and incarceration and throughout the proceedings in this very difficult situation.

Even as he has been detained for this offense, Mr. Rahman has continued to demonstrate his selflessness and desire to be a productive member of his community. Drawing on his experience serving as a tutor in high school, Mr. Rahman has applied to serve as a tutor to inmates studying to earn GEDs. Mr. Rahman looks forward to continuing to use the educational and professional

opportunities he is fortunate to have had to help other inmates, as well as to availing himself of reentry programs that allow him to learn and benefit from their experiences.

Upon completion of his term of imprisonment, Mr. Rahman's values, work ethic, and family commitments will ensure he is as productive a member of society, just as he was before this case. Mr. Rahman plans to reside in the Washington, D.C. metropolitan area with Deandra, where he will benefit from the support from his family. Mr. Rahman's parents currently reside in Bethesda, Maryland, and following her graduation from business school, one of his sisters plans to move to the area to be close to Mr. Rahman. Mr. Rahman and Deandra hope to raise children as soon as practicable after the disposition of Mr. Rahman's case. Though Mr. Rahman understands he can no longer return to his career in the intelligence service, he hopes to find opportunities to work in the private sector, to the extent permitted by his conviction. A shorter sentence would allow him to more easily obtain employment following his release. Mr. Rahman's strong support network, sense of responsibility, and motivation to make amends will ensure that he is quickly able to get back on his feet.

b.    Service and Devotion to Country

Mr. Rahman is a proud American. In 2014, as he was entering business school, Mr. Rahman decided to seek employment with the U.S. government upon graduation, motivated by a strong desire to serve his country and be part of a mission-focused organization. In 2016, Mr. Rahman began working as an analyst for the CIA, leaving behind a considerably higher-paying job in New York's financial services industry. His demonstrated commitment to hard work and desire to advance American interests earned him competitive assignments, including long-term assignments, in Iraq—for which assignment he received war zone and joint duty recognition—as well as two assignments in Asia. Overall, Mr. Rahman was recognized with 22 exceptional performance awards for his CIA service, a notable achievement given the number of years he

served. In fact, Deputy Commander Major General Ekman noted that he has "never met a more thoughtful and articulate analyst" than Mr. Rahman. Mr. Rahman also contributed positively to the CIA workforce, including by mentoring more junior analysts and interviewing and helping recruit job applicants.

Notwithstanding the serious transgressions that occurred over several months last year, Mr. Rahman was by all accounts a star performer at the CIA for nearly eight years. Prior to his arrest in this case, Mr. Rahman held steady employment and had never been arrested nor faced disciplinary action or adverse assessment at work. His performance evaluations are uniformly glowing, each containing descriptors such as "exemplary," "indispensable," "laudatory," and "exceptional," while showcasing work in which he "leveraged his outstanding critical thinking, expertise, and tradecraft to create knew knowledge," and his "profound critical thinking skills, quiet leadership, and unflappable calm under pressure." Regarding his time in Iraq, his leadership noted that he portrayed "exactly the sort of leadership and teamwork that we want to see in our officers during times of crisis" (emphasis added). This high praise exemplifies Mr. Rahman's true character and nature, standing in stark contrast to his aberrant and incomprehensible actions last year.

### 2.    The Nature and Circumstances of the Offense

Mr. Rahman fully supports U.S. laws protecting against the unauthorized retention and transmission of national defense information and understands the seriousness of violations of those laws. The nature and circumstances of his offense are fully described in the Statement of Facts, and Mr. Rahman does not dispute the wrongfulness of his disclosures of classified information. *See* ECF No. 58. Notably, however, Mr. Rahman's offense was not born of malice toward the United States, nor of a profit motive. Instead, it arose from a complex intersection of personal vulnerabilities, psychological injury, and a profound lapse in judgment. Prior to this offense, Mr.

Rahman lived an entirely law-abiding life, serving the national interest with great distinction. The pressures that Mr. Rahman experienced that led to his impairment of judgment and poor decision-making do not excuse his conduct but are offered to provide important context for the Court's sentencing determination. Viewed as a whole, the mitigating circumstances surrounding Mr. Rahman's offense further support the requested departure or variance from the advisory Guidelines range.

a.    Mr. Rahman's Mental State

Mr. Rahman's violations were a complete and utter deviation from the characteristics of responsibility, integrity, and patriotism that have defined him. Up until spring of 2024, Mr. Rahman served as a CIA analyst for nearly eight years without any incident of mishandling classified information. As Dr. Shauna Keller explains in her report, Mr. Rahman's offense was a consequence of the confluence of emotionally destabilizing events and personal struggles that had temporarily afflicted him in the months during his disclosures. *See* Exhibit C.

Dr. Keller met with Mr. Rahman to explore the personal and mental health circumstances that contributed to his offense. She prepared a thorough report, submitted under seal, that explains these circumstances in detail. The Court will have the benefit of reviewing the full report to understand this context. Notably, as part of his CIA service, Mr. Rahman served a one-year assignment in Baghdad, Iraq. Mr. Rahman endured significant risk to his personal safety and security, and the daily stress of this environment took a severe toll on his mental health.

Unknown to everyone at the time, including Mr. Rahman, this assignment left a lasting and deep mark on his mental health. Events in the Middle East that began in the fall of 2023 revived his traumatic experiences in Iraq in a profoundly destabilizing and unforeseeable way, as contemporaneously reflected in Mr. Rahman's journal. This destabilization triggered a temporary gross impairment in judgment which was amplified when Mr. Rahman and his wife lost a baby on

12

the eve of their departure to Cambodia, requiring her to remain stateside for medical reasons. Dr. Keller explains how these traumatic professional challenges and personal hardships contributed to his emotional dysregulation and sense of helplessness, which he has himself described as feeling out of balance and in a state of emotional distress. Dr. Keller offers this context on pages 9 to 11 of her report. Upset that his work might be contributing to what he saw as a dangerous and escalating conflict in the region, as he had experienced in Baghdad, Mr. Rahman had the irrational sense that he must take steps to mitigate the potential harm to U.S. interests and somehow help advance the interests of peace. He now recognizes these feelings were distorted, but regardless, his actions were motivated by what he perceived to be in our nation's best interests, not by any desire to do harm but quite the opposite.

Since Mr. Rahman's arrest in November 2024, he has confronted his atypical, subliminal stressors and realized the full extent of their detrimental impact on his decision-making. Mr. Rahman now recognizes that he violated the trust the United States government placed in him, and he is ashamed that he allowed his emotional difficulties to impair his rational thinking and tarnish his record of service to the nation. Mr. Rahman fully understands that his offense was not an appropriate response to global events and personal tragedy. Mr. Rahman failed to manage adequately his emotional state, and he understands that he alone is responsible for the consequences of his serious transgressions. As Dr. Keller explains, Mr. Rahman poses a very low risk for recidivism for manifold reasons, including his commitment to seeking proper mental health support for his traumatic experiences in Iraq and family-related grief.

Mr. Rahman knows that this context does not excuse his conduct. This context does, however, make plain that Mr. Rahman never intended to harm the United States or its interests. Mr. Rahman did not disclose classified information to betray his country or assist a foreign

government, nor did he do so to enrich himself or to obtain any personal gain. Nor has the government alleged that Mr. Rahman acted with any such motive. Rather, clouded by his overwhelming emotional struggles, Mr. Rahman made a terrible mistake during the worst period of his life, and he deeply regrets his conduct. These circumstances differentiate Mr. Rahman's offense from other Espionage Act prosecutions and independently justify a substantial departure or variance.

      b.  Nature of the Disclosures

   Mr. Rahman knows that any unauthorized disclosure of classified national defense information is serious and inexcusable. Mr. Rahman is deeply ashamed of disclosing classified information which, by definition as to any Top Secret information, conceivably could have caused "exceptionally grave damage" to the national security, per the relevant executive order. Exec. Order No. 13,526, § 1.2(a)(1), 75 Fed. Reg. 707 (Dec. 29, 2009). Mr. Rahman has through his cooperation made every effort to prevent any actual harm as a result of these disclosures.

   In short, Mr. Rahman's prompt cooperation and candor in the aftermath of his disclosures should provide the government with invaluable tools to mitigate and thwart possible harm.

     3.  <u>The Need to Avoid Unwarranted Sentencing Disparities</u>

      a.  Comparable Cases

   While each national security case is somewhat s*ui generis*, a sentence greater than that imposed in cases involving similar or more serious factual circumstances is inappropriate under the circumstances. Moreover, courts, including those in this District, have imposed substantial downward variances from the Guidelines ranges that attach to crimes for leaking classified information. In cases that involved comparable disclosures of classified information in terms of the nature and limited volume of material disclosed, courts have imposed terms of imprisonment between 13 and 30 months.

First, in *United States v. Frese*, No. 1:19-cr-304 (LMB) (E.D. Va. 2019), a Defense Intelligence Agency (DIA) counterterrorism analyst pled guilty to willful transmission of national defense information in violation of Section 793. Plea Agreement ¶ 1, *Frese*, ECF No. 41. Henry Frese disclosed classified information over a period of 17 months to reporters, including information related to foreign countries' weapons systems. Statement of Facts ¶¶ 1, 8, 13, *Frese*, ECF No. 42. The court sentenced Mr. Frese to 30 months' imprisonment, a significant downward variance from his advisory Guidelines sentence of 120 months. Judgment, *Frese*, ECF No. 59. At least a similar variance from Mr. Rahman's Guidelines range of 63 to 78 months is warranted here. However, while Mr. Frese, like Mr. Rahman, cooperated with the government and accepted responsibility for his actions, Mr. Rahman did so more promptly than Frese, who pled guilty 132 days after his arraignment. *See* Arraignment, *Frese*, ECF No. 14. By comparison, Mr. Rahman pled guilty 37 days after his arraignment.

Mr. Rahman's conduct differs materially from Mr. Frese's in several respects, which supports a greater departure or variance in this case and the requested sentence of 13 months' imprisonment. Mr. Frese began disclosing classified information only a year into his DIA service and did so for 17 months. Statement of Facts ¶¶ 1–2, 13–26, *Frese*, ECF No. 42. By contrast, Mr. Rahman's disclosures took place over a much shorter period and were a blip—no doubt a serious one—in his otherwise blemish-free eight-year career with the CIA. Moreover, the scope of Mr. Frese's wrongdoing far exceeded that of Mr. Rahman. Mr. Frese not only passed classified information to two reporters, but he also conducted searches on classified government systems on 30 separate occasions for information about topics he discussed with the reporters, ran targeted searches on classified systems at their behest, left his duty station during work hours to call them and relay information he learned from his searches, and confirmed the accuracy of classified

information they had learned elsewhere from other sources. *Id.* ¶¶ 16, 18–20. Mr. Frese called and texted the journalists hundreds of times. *Id.* ¶¶ 22–23. Mr. Frese also "retweeted" a journalist's article containing the classified information he had leaked, thereby further disseminating the sensitive information he disclosed. *Id.* ¶ 17. By contrast, Mr. Rahman engaged in no such egregious conduct—he did not communicate extensively with recipients of the leaked information, nor did he act as an agent for another party. While Mr. Rahman understands the gravity of any unauthorized disclosure of classified information, a sentence approaching Mr. Frese's 30-month term of imprisonment would result in an unwarranted disparity. Our recommendation of 13 months, by contrast, would appropriately reflect the differences between these cases.

Second, *United States v. Kim*, No. 1:10-cr-225 (D.D.C. 2010), further supports Mr. Rahman's requested sentence. Stephen Kim, an employee with the Department of State's Bureau of Verification, Compliance, and Implementation, disclosed Top Secret information on North Korea's military capabilities and preparedness to a journalist, who then published the information online. Statement of Offense ¶¶ 6–9, *Kim*, ECF No. 273. Despite facing a Guidelines sentence of 120 months, Mr. Kim was sentenced to 13 months of imprisonment. Sentencing Tr. 4, 34, *Kim*, ECF No. 299. In contrast to Mr. Rahman, however, Mr. Kim pled guilty only after engaging in three-and-a-half years of litigation, which included extensive Classified Information Procedures Act ("CIPA") hearings and motions practice. Mr. Kim also admitted to lying to the FBI about having been in contact with the journalist to whom he disclosed classified information. Statement of Offense ¶¶ 6–8, 11, *Kim*, ECF No. 273. By contrast, Mr. Rahman has been forthcoming and fully cooperative with the government. He quickly took responsibility for his actions and saved the government and the court the burden of engaging in extensive pretrial and CIPA litigation. These facts illustrate that a sentence of 13 months' imprisonment is just and appropriate for Mr.

16

Rahman. In fact, a 13-month sentence for Mr. Rahman would reflect far less of a downward departure than the variance Mr. Kim received.

Third, *United States v. Leibowitz*, No. 8:09-cr-632 (D. Md. 2009), demonstrates that Mr. Rahman's requested sentence of 13 months is within the range of reasonable sentences for his offense. Shamai Leibowitz, an FBI employee, provided 200 pages of classified documents to a blog host who then published information derived from those documents online. Factual Stipulation at 1, *Leibowitz*, ECF No. 6-1; *see also Case Study: Unauthorized Disclosure*, Center for Development & Security Excellence.[1] Mr. Leibowitz pled guilty to the willful disclosure of intelligence information to persons unauthorized to receive it in violation of the Espionage Act,[2] and was sentenced to 20 months of imprisonment. Plea Agreement ¶ 1, *Leibowitz*, ECF No. 6; Sentencing Tr. 11–12, *Leibowitz*, ECF No. 27.

*Frese*, *Kim*, and *Leibowitz* demonstrate the appropriateness of granting a substantial downward departure from the Guidelines' range in Mr. Rahman's case to avoid unwarranted sentencing disparities. In all three cases, the defendants pled guilty to leaking a relatively limited quantity of national defense information from a position of trust in violation of the Espionage Act, resulting in the publication of that information online. Because Mr. Rahman's conduct is significantly less aggravating, and his cooperation much more prompt and fulsome, than defendants sentenced to between 13 and 30 months' imprisonment, Mr. Rahman submits that a

---

[1] Available at https://www.cdse.edu/Portals/124/Documents/casestudies/case-study-shamai-leibowitz.pdf (last accessed May 4, 2025).

[2] Mr. Leibowitz pled guilty to violating Section 798(a)(3), not Section 793. Section 798(a)(3) concerns "classified information . . . concerning the communication intelligence activities of the United States or any foreign government," whereas Section 793 concerns information and materials "relating to the national defense." 18 U.S.C. §§ 793(e), 798(a)(3). That distinction is immaterial, for, in both *Leibowitz* and Mr. Rahman's case, the government and defense agree that U.S.S.G. § 2M3.3(a) applies to the conduct. ECF No. 57 at ¶ 4; Plea Agreement ¶ 7(a), *Leibowitz*, ECF No. 6.

sentence at the lower end of that range adequately reflects the seriousness of his offense and avoids any unwarranted sentence disparities.

b.    Other Cases

Mr. Rahman also requests that the Court consider other, far more egregious (and less comparable) cases involving leaks of classified information that resulted in substantially lower and higher sentences than the requested sentence. These cases further illustrate the appropriateness of a sentence of 13 months' imprisonment.

Several other prosecutions involving far more egregious leaks of classified information make plain that a sentence of 13 months' imprisonment is appropriate in this case. In *United States v. Kiriakou*, No. 1:12-cr-127 (LMB) (E.D. Va. 2012), John Kiriakou was sentenced to 30 months' imprisonment for leaking classified information to a reporter. Mr. Kiriakou was convicted of disclosing the identity of CIA officers and endangered the safety of covert agents; according to the government, he did so to raise his media profile and advance his private pecuniary interests. Statement of Facts ¶¶ 8–19, *Kiriakou*, ECF No. 115; Sentencing Tr. 14, *Kiriakou*, ECF No. 130. No comparable allegations are present here in Mr. Rahman's case. Similarly, in *United States v. Sterling*, No. 1:10-cr-485 (LMB) (E.D. Va. 2010), Jeffrey Sterling was convicted by a jury and sentenced to 42 months' imprisonment for violating Section 793, but, according to the government, his disclosures about the Iranian nuclear program "compromis[ed] one of the most important, closely held, and sensitive intelligence operations" and placed in harm's way two human sources and their families. United States' Memorandum in Aid of Sentencing at 2, 4, *Sterling*, ECF No. 464. Moreover, as the court emphasized in imposing sentence, Mr. Sterling did not admit his guilt. Sentencing Tr. 25, *Sterling*, ECF No. 475.

Similarly, in *United States v. Teixeira,* No. 1:23-cr-10159 (D. Mass. 2023), Jack Teixeira, an air national guardsman, was sentenced to 180 months' imprisonment after he pled guilty to six

18

counts of violating Section 793. Plea Agreement ¶ 1, *Teixeira*, ECF No. 130; Sentencing Tr. 39, 41, *Teixeira*, ECF No. 156. According to the government, Mr. Teixeira was "responsible for engaging in one of the most significant leaks of classified documents and information in United States history," and he removed "hundreds" of classified documents and posted national defense information on a messaging platform "to satisfy his own ego." Government's Sentencing Memorandum at 4–6, 9, *Teixeira*, ECF No. 144. Mr. Rahman's offense, while serious, does not come anywhere close to Mr. Teixeria's conduct.

Mr. Rahman's disclosures were also more limited in number, distinguishing this case from *United States v. Albury*, No. 18-cr-67 (D. Minn. 2018). Terry Albury, an FBI agent, was sentenced to 48 months' imprisonment after he pled guilty to two counts of unlawful retention and transmission of national defense information. Sentencing Tr. 34, *Albury*, ECF No. 58. Mr. Albury had been secretly taking and transmitting national defense and classified information for a period of 18 months, and the government found 58 sensitive and classified documents at his home in an envelope affixed with a reporter's telephone number. Plea Agreement & Sentencing Stipulations ¶ 2(f)–(i), *Albury*, ECF No. 16. These facts distinguish *Albury* from cases like *Frese*, *Kim*, *Leibowitz*, and Mr. Rahman's case, all of which involved disclosures on a smaller scale.

Mr. Rahman's prompt admission of guilt, acceptance of responsibility, and proactive cooperation with the government distinguish this case from others in which defendants received lengthier sentences. For instance, in *United States v. Winner*, No. 1:17-cr-34 (S.D. Ga. 2017), Reality Winner, an NSA contractor, was sentenced to 63 months' imprisonment for mailing to a news outlet an intelligence report that revealed intelligence sources and methods pursuant to a Rule 11(c)(1)(C) plea. Sentencing Tr. 21–23, *Winner*, ECF No. 328. Ms. Winner pled guilty over one year after her arraignment, after substantial classified discovery litigation had occurred. *See*

Arraignment, *Winner*, ECF No. 26; Change of Plea, *Winner*, ECF No. 316. In *United States v. Hale*, No. 1:19-cr-59 (LO) (E.D. Va. 2019), Daniel Hale was sentenced to 45 months in prison for unlawful retention and transmission of national defense information. Sentencing Tr. 34, *Hale*, ECF No. 254. Mr. Hale pled guilty almost two years after he was arraigned and only five days before his jury trial was set to begin. *See* Arraignment, *Hale*, ECF No. 19; Order, *Hale*, ECF No. 171; Change of Plea Tr. 14, *Hale*, ECF No. 255. For the enormous resources defendant Mr. Hale cost the government and the court before accepting responsibility, his case is not analogous to Mr. Rahman's.

Finally, in several cases involving unauthorized access, retention, and disclosure of sensitive information, defendants were sentenced to time served or no term of imprisonment. *See United States v. Hitselberger*, No. 1:12-cr-231 (D.D.C. 2012) (National Security Agency (NSA) employee sentenced to time served after nearly two months in custody for leaking classified materials regarding Bahrain to the Hoover Institution); *United States v. Petraeus*, No. 3:15-cr-47 (W.D.N.C. 2015) (former CIA Director and U.S. Army Four-Star General sentenced to two years of probation and a $100,000 fine for providing his biographer with "Black Books" containing the identities of covert officers, Afghanistan war strategy, intelligence capabilities, diplomatic discussions, and quotes from high-level National Security Council discussions); *see also United States v. Drake*, No. 1:10-cr-181 (D. Md. 2010) (NSA employee sentenced to one year of probation and 240 hours of community service for exceeding authorized computer access to provide information to an unauthorized recipient). Mr. Rahman does not claim that his offense is directly comparable to these cases, but the imposition of time served or no custodial sentence in these cases demonstrates that a much greater sentence of at least one year of imprisonment would adequately reflect the seriousness of Mr. Rahman's conduct.

4.     <u>Providing Just Punishment and Adequate Deterrence to Criminal Conduct</u>

The remaining sentencing factors—including the need to provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public—similarly point in favor of a sentence of 13 months' imprisonment.

The requested sentence is sufficient to reflect the seriousness of Mr. Rahman's offense, because, as discussed above, courts have imposed similar terms of imprisonment for similar or more culpable conduct. Moreover, Mr. Rahman now has a serious felony conviction that prohibits him from ever working in intelligence or national defense in the future. The conviction will also forever hinder his ability to work in other professions. In view of Mr. Rahman's cooperation and the full circumstances of his offense, a sentence of 13 months' imprisonment provides just punishment.

As for deterrence, Mr. Rahman's arrest and conviction—which have been widely covered in numerous media publications—serve a cautionary tale to any government employee with access to classified information. Mr. Rahman himself has suffered significant personal and professional losses as a result of his offense. A term of imprisonment of at least one year, a period of supervision, and the career-ending consequences of his conviction are sufficient to deter Mr. Rahman and others from engaging in similar offenses in the future.

Finally, there is no nexus between a lengthier period of incarceration and any further need to protect the public from future criminal conduct. Mr. Rahman lost his security clearance following his arrest and will never regain access to classified information. Further, Mr. Rahman's complete and forthcoming cooperation with the government, coupled with his personal history and characteristics, demonstrate that he will not reoffend. Mr. Rahman has the motivation and resources—a commendable education and career, a supportive and tight-knit family, and a

commitment to service and community—to reenter and contribute productively to society upon his release.

As reflected in *Frese*, *Kim*, and *Leibowitz*, a period of supervised release ranging from one year to three years is appropriate depending on the circumstances of the case. For the same reasons this Court should sentence Mr. Rahman to 13 months' imprisonment, a sentence of one year of supervised release is sufficient but not more than necessary in light of the Section 3553(a) factors. Mr. Rahman would be pleased to perform a term of community service as part of his supervised release.

## IV.    CONCLUSION

A confluence of professional and personal circumstances culminated in Asif Rahman making serious mistakes, including breaking the law, that have surprised and disappointed everyone around him. For that he is profoundly sorry. But he admits and accepts full responsibility for his offense and has undertaken extraordinary steps to assist the government with respect to mitigating and preventing future harm. A significant downward departure and/or variance from the advisory Guidelines would properly reflect his unusual circumstances, exemplary prior record, substantial and complete cooperation, and genuine remorse, as well as the critical national security benefits derived from his assistance.

Mr. Rahman respectfully requests that the Court impose a sentence of no more than 13 months' imprisonment and one year of supervised release, coupled with community service, which would be sufficient but not greater than necessary to serve the goals of deterrence, respect for law, and public safety.

Respectfully submitted,

Asif William Rahman

Date:   May 6, 2025                    By:  _____
                                            Amy Jeffress (VA Bar No. 36060)
                                            Hecker Fink LLP
                                            1050 K St. NW, Suite 1040
                                            Washington, D.C. 20001
                                            Telephone: (202) 742-2655
                                            ajeffress@heckerfink.com


                                       By:  _____
                                            Deborah Curtis (admitted *pro hac vice*)
                                            Arnold & Porter Kaye Scholer LLP
                                            601 Massachusetts Ave., NW
                                            Washington, D.C. 20001
                                            Telephone: (202) 942-5081
                                            Deborah.Curtis@arnoldporter.com

                                            *Attorneys for Defendant*


Attachments:

    Exhibit A: Letter from Asif Rahman
    Exhibit B: Letters from Family and Friends (filed under seal)
    Exhibit C: Report of Dr. Shauna Keller (filed under seal)
    Exhibit D: Declaration of William McCausland (filed under seal)