## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:24-cr-249 (PTG) |
| ASIF WILLIAM RAHMAN, | |
| *Defendant.* | |

## <u>DEFENDANT'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM</u>

Defendant Asif William Rahman entered a plea of guilty in this case on January 17, 2025, having negotiated a plea agreement in good faith with the U.S. Department of Justice. Due to Mr. Rahman's early and fulsome cooperation, the prosecutors were aware of the full scope of Mr. Rahman's conduct at the time of the plea negotiations and offer. The plea agreement included a stipulated Guidelines range for disclosing Top Secret information, comprising the two counts charged in the Indictment and a broad Statement of Facts describing the full scope of Mr. Rahman's conduct, including information that Mr. Rahman provided that was not previously known to the government. The plea agreement also included a provision for a downward departure should Mr. Rahman's cooperation merit a departure for substantial assistance pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 5K1.1. The parties' understanding was that this downward departure, if granted, would enable the Court to depart downward from the stipulated

1

Guidelines range. At no time did the government indicate that the Guidelines range it proposed—63 to 78 months—did not cover the full scope of the conduct described in the Statement of Facts.[1]

The government has determined that Mr. Rahman has provided substantial assistance and moved for that departure. *See* United States Sentencing Memorandum ("Gov't Mem.") at 13, ECF No. 72. Despite Mr. Rahman's substantial cooperation, however, the government has now recommended that the Court depart *upward* from the stipulated Guidelines range, to 108 months' imprisonment, by applying a variance never contemplated in the parties' agreement. Counsel are not aware of any case in which the government has ever taken this position for a successful cooperator following a guilty plea. The request is a violation of the spirit if not the letter of the parties' agreement, and is unlawful for the reasons set forth below. Counsel submit this response to the government's sentencing memorandum in order to address points that defense counsel did not and could not have anticipated. The defense stands firmly behind our recommendation that a sentence of 13 months in custody is sufficient to serve the interests of justice.

## I.      The Court Should Disregard the Government's Recommendation

The government's request for an upward variance in this case is unprecedented and contrary to the parties' understanding of how both the government and Mr. Rahman would benefit from an early plea with full cooperation. It is also a violation of the law, as it relies substantially on information that Mr. Rahman provided in the course of his cooperation. For these reasons, and to uphold the rule of law, the Court should disregard this belated, unlawful, and unjust recommendation.

---

[1] The Statement of Facts is vague by design to avoid disclosing classified information which the government did not have the authority or ability to adduce in open court in an adversarial setting.  By stipulating to these facts, Mr. Rahman relieved the government of this potentially insurmountable hurdle and, accordingly, received a benefit in the form of a lower negotiated Guidelines range as part of the plea bargain.

### A.     The Upward Variance Request Is Unprecedented and Contrary to Past Practices

The government's request here is unprecedented. The defense has submitted a supplemental declaration from Mr. William McCausland, who has personally handled nearly 40 cooperators as a former supervisory FBI agent and senior CIA official. Mr. McCausland opined that he has never seen the government make such a request in his 25 years in law enforcement. *See* Exhibit A at 1. He also noted that, in his experience, the government's request for an upward variance in this case is "not standard practice" and "could have the unfortunate effect of discouraging full and truthful cooperation" in other cases. *Id.* at 1–2.

### B.     The Upward Variance Request Is Contrary to the Parties' Understanding

The upward variance request is fully at odds with the history of this case and contrary to defense counsel's understanding of how the government would determine its position with respect to sentencing. On November 25, 2024, before Mr. Rahman had even arrived in this District, government counsel[2] invited both defense counsel to meet in the secure facility in the National Security Division's offices at Main Justice to discuss the case. As both government and defense counsel were well aware, national security cases are very difficult to prosecute because of the need to protect the classified information and other government interests that can be jeopardized when these cases go forward to contested litigation. Moreover, prompt cooperation is essential to possibly thwarting harm from any disclosures and filling in necessary intelligence "gaps." Thus, it was in the best interest of the government to obtain a prompt cooperation agreement.

---

[2] Regrettably, the National Security Division prosecutor initially assigned to this case was terminated shortly after the plea hearing. *See* Josh Gerstein, *Acting Attorney General Fires Prosecutors Who Worked for Special Counsel Jack Smith*, Politico (Jan. 27, 2025), https://www.politico.com/news/2025/01/27/justice-department-firings-jack-smith-00200845; Perry Stein & Mark Berman, *Justice, FBI Ousters Remove Longtime Experts From Daily Threats Meeting*, Wash. Post (Feb. 12, 2025), https://www.washingtonpost.com/national-security/2025/02/12/justice-fbi-nationa-security-threats-trump/.

This meeting had the effect that the government intended, leading to a swift resolution of the case. Mr. Rahman was ready to cooperate fully. He quickly agreed to participate in proffer sessions with the prosecutors and the FBI agents on the case, and these interviews took place on December 31, 2024, and January 3, 2025. This timing required both defense and government counsel to prepare and meet in person over the holidays. Despite the holiday work and the lack of time for government counsel to provide full discovery—or any classified discovery whatsoever— all parties were fully committed to this process. Mr. Rahman provided complete and truthful information about his conduct in those two initial proffer sessions, sparing the government the many difficulties inherent in investigating and prosecuting a case of this nature. Following those proffer sessions, government counsel were satisfied that Mr. Rahman had provided full information to allow them to negotiate a plea agreement that would include the potential for a departure for substantial assistance under U.S.S.G. § 5K1.1. The parties then negotiated the plea agreement, under which Mr. Rahman agreed to plead guilty to two violations of 18 U.S.C. § 793(e), with the stipulated advisory Guidelines range applicable to the disclosure of Top Secret information, as set forth in the plea agreement, as well as the potential for the defendant to earn a downward departure for substantial assistance to the government. There was no reference to the upward variance prior to the government's filing of its sentencing memorandum on May 6, 2025.

## C.    The Upward Variance Request Is Inconsistent with the Presentence Report

The government's requested variance is also at odds with the Presentence Investigation Report ("PSR"). The PSR noted that "[t]he probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range." PSR ¶ 92, ECF No. 67. This provision was included in the draft PSR provided to the parties on April 9, 2025, *see* ECF No. 64 ¶ 92, and on April 25, 2025, the prosecutor informed the probation officer that the government had no objections to the PSR, *see* Addendum, PSR at 23, ECF No. 67. The government

did not otherwise dispute the probation officer's conclusion that there were no factors in this case that would warrant application of a higher Guidelines range or an upward variance or departure. This omission suggests that, two weeks before filing their sentencing memorandum, the prosecutors were not taking the position that it would be appropriate to depart or vary upward from the Guidelines range.

### D.    The Upward Variance Request Violates the Law

Even more troubling, the variance request is in violation of the law, as it relies substantially on information that the Defendant provided in the course of his cooperation. U.S.S.G. § 1B1.8 provides:

> Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

U.S.S.G. §1B1.8(a).  The Application Notes make clear that this principle also applies to a request to depart or vary upward:

> Although the guideline itself affects only the determination of the guideline range, the policy of the Commission, as a corollary, is that information prohibited from being used to determine the applicable guideline range shall not be used to depart upward.

*Id.*, Application Note 1. (This Application Note was first adopted in similar form in 1988, *see* U.S.S.G. §1B1.8, Application Note 1 (1988), prior to the decision in *United States v. Booker*, 543 U.S. 220 (2005), which allowed variances in addition to departures, and so it applies equally to upward departures and variances.) Although the Guidelines permit the use of information already known to the government, the government's sentencing recommendation is based in substantial

part on information that Mr. Rahman provided that was not previously known to the government.[3] This information is detailed below.

1.   Page One, Line One, "Throughout 2024"

Mr. Rahman pled guilty to disclosing two documents in mid-October 2024. Prior to his cooperation, the government was aware of seven other documents he had disclosed in the fall of 2024. His conduct prior to the fall of 2024 was not known to the government before he cooperated. Thus, within the first two words of the body of the government's memorandum, the government violated U.S.S.G. § 1B1.8.

2.   Page One, Line 10

The government was aware that Mr. Rahman had deleted information from his computer system, but was not aware until he informed them that he had destroyed one of his phones. This line is the second reference, on the very first page of the government's memorandum, to information that the government would not have known without Mr. Rahman's cooperation but has nonetheless relied upon for its unprecedented request for an upward variance. This paragraph violates U.S.S.G. § 1B1.8.

3.   Page Five, First Paragraph

The government was not aware of Mr. Rahman's conduct set forth in this paragraph prior to his cooperation, and would not have ever known how he handled the materials he accessed and disclosed without the benefit of his cooperation. This paragraph violates U.S.S.G. § 1B1.8.

---

[3] Defense counsel have never been provided full discovery on what information the government possessed prior to Mr. Rahman's cooperation, but the information listed in this Section was news to government counsel at the time of Mr. Rahman's proffer sessions, and some of it by its nature could have never been known without his cooperation. Defense counsel are not suggesting that government counsel have deliberately violated the law; rather, due to the personnel turnover and other staffing challenges, the inclusion of information from Mr. Rahman's cooperation could well be inadvertent.

4.  Page Five, Second Paragraph

As with the first paragraph on page five, the description of how Mr. Rahman handled the information he disclosed was not known to the government, and would never have been fully understood, without the benefit of his cooperation. This paragraph violates U.S.S.G. § 1B1.8.

5.  Page Six, Second Paragraph

Again, this paragraph contains details about Mr. Rahman's conduct that the government would not have known without his cooperation. There would not have been any way the government would have ever known the information in lines 8 to 12 without the benefit of Mr. Rahman's cooperation. This paragraph violates U.S.S.G. Section 1B1.8. Defense counsel is not certain whether the other information on this page was previously known to the government because no discovery has been provided concerning what information the government knew about his communications prior to his cooperation.

6.  Page Seven, Lines 10–11

Again, the government would not have known how Mr. Rahman handled the documents without the benefit of his cooperation. This paragraph violates U.S.S.G. § 1B1.8.

7.  Page 10, Lines 8–12

The government here relies exclusively on information that Mr. Rahman provided during the course of his cooperation. This paragraph violates U.S.S.G. § 1B1.8.

8.  Page 17, Line 18

The government here again discusses Mr. Rahman's conduct prior to the fall of 2024, which the government was not aware of until he cooperated. This reference to "nearly a year" is not even consistent with the facts Mr. Rahman provided, and thus misstates the temporal scope of his conduct. This paragraph is misleading and violates U.S.S.G. § 1B1.8.

9. <u>Page 23, Lines 3–7</u>

This paragraph repeats the details from Mr. Rahman's proffer regarding his conduct, which the government would not have known without the benefit of his cooperation. As with all of the prior statements listed in this Section, this paragraph violates U.S.S.G. § 1B1.8.

As this listing makes clear, the government's memorandum relies heavily on information not previously known before Mr. Rahman cooperated in order to justify its unprecedented and unfair variance request. The government has impermissibly included all of this factual information in support of its request, making clear that it considers this information from the defendant's cooperation to be significant, which belies the statement that "the remainder of defendant's cooperation largely amounted to corroboration of information the government previously knew." Gov't Mem. at 13. Whatever the government meant by "remainder," that statement is not supported by its extensive reliance on information that Mr. Rahman provided in his debriefings that the government did not know previously.[4]

## II.     The Government's Arguments Are Unfounded

The government relies on a series of unsupported—and at times misleading—arguments to support its unprecedented and unfair request for an upward variance.

### A.     The Court Should Strike Deputy Director Ellis's Misleading Letter

The government relies conspicuously on a letter from CIA Deputy Director Michael Ellis which makes sweeping and unfounded allegations of actual harm that are unsupported by any information submitted in the case or known to the defense, and are inconsistent with the much more careful language of the government's sentencing memorandum. *See* Gov't Mem., Exhibit A, ECF No. 72-1 ("Ellis Letter"). Without any support, Mr. Ellis states that Mr. Rahman's

---

[4] Should the Court deny our motion to preclude consideration of the classified material, we could demonstrate that it is similarly replete with information known solely through Mr. Rahman's cooperation.

unauthorized disclosures "have caused serious, and in some instances exceptionally grave, damage to U.S. national security and the CIA." *Id.* at 1. Mr. Ellis further states that Mr. Rahman's actions "jeopardized intelligence sources and methods, undermined U.S. intelligence-sharing partnerships, and compromised information regarding sensitive intelligence targets of interest," and "affected the Agency's ability to collect foreign intelligence, preempt threats to the United States, and further key U.S. national security objectives." *Id.*

Notably, the government's other submissions are heavily caveated and do not support these general, sweeping statements of actual harm caused by the disclosures. A careful review of the government's sentencing memorandum reveals significant disparities between that memorandum, which discusses only a potential risk of harm, and Mr. Ellis's letter. The following citations from the government's memorandum demonstrate this point:

1. Page One, lines 7–8: "risking, by definition, *exceptionally grave damage*"

2. Page Two, line 10: "posed a significant national security threat"

3. Page Two, line 12: "potential harm"

4. Page 14, line 10: "potential danger"

5. Pages 14–15, last and first lines: "increased risk . . . to the nation's security"

6. Page 17, lines 6–7: "jeopardized national security"

7. Page 17, line 10: "potential harm"

8. Page 17, last line: "reasonably foreseeable"

9. Page 19, line 9: "could be damaging"

10. Page 21, line 8: "harms that could have occurred"

11. Page 30, line 6: "risk of harm"

Indeed, the government took pains to cite a case for the proposition that there is no need to show

9

actual harm to national security, in clear recognition that it could not make this showing.  Gov't Mem. at 17 (citing *United States v. Morison*, 844 F.2d 1057, 1071 (4th Cir.1988)). Nowhere in the government's sentencing memorandum is there a single reference to any actual harm caused by Mr. Rahman's conduct—in stark contrast to the conclusory language of Mr. Ellis's letter.

Defense counsel have moved to preclude the Court from considering the classified information, which Mr. Ellis refers to as a "classified declaration to this letter which describes the substantial harm in greater detail," Ellis Letter at 1, but that information, even if accepted by the Court, is similarly carefully worded. Oddly, Mr. Ellis's letter is dated May 1, 2025, though the classified declaration that is supposed to support it is dated May 5, 2025, and was not provided to defense counsel until May 8, 2025. But regardless, defense counsel have since reviewed the classified information that the government belatedly disclosed (though not to Mr. Rahman himself), and have not identified any references to support Mr. Ellis's assertions that Mr. Rahman's conduct has caused *actual harm* to national security.[5] Neither the unclassified nor the classified material offers information relating to actual harm that supports these sweeping claims.

Mr. Ellis's conclusory assertions of actual harm and the sentencing memorandum's more cautious references to potential harm contrast sharply with how the government has taken the position that *harm was actually caused* by the disclosure of classified information in other cases. In *United States v. Teixeira*, No. 1:23-cr-10159 (D. Mass. 2023), the government definitively stated that "[t]he harm the defendant caused to the national security from his disclosures of national defense information is extraordinary," pointing to classified declarations that "set out in detail the harms that have already occurred and the harm that the United States will continue to endure," as

---

[5] To the contrary, an unclassified portion of the classified declaration from the CIA provides "examples of the serious, and in some cases exceptionally grave, damage to the national security of the United States that *could result* from the Defendant's unauthorized disclosures." p. 15 (emphasis added).

well as an unclassified declaration filed by then-Secretary of the Air Force Frank Kendall III. *Teixeira*, Gov't Sentencing Mem. at 1, 5, 12, ECF No. 144. In contrast to Mr. Ellis's letter, Secretary Kendall's declaration explained "the harm that the defendant's actions caused," which included an "operational pause" of more than 370 personnel of the Distributed Ground Station mission that "rendered the organization unable to perform its critical mission to provide intelligence, surveillance, and reconnaissance analysis to warfighters, supported leaders, and combatant commanders around the world," such as "providing advance warnings of an enemy attack for service men and women that are in a combat environment." *Teixeira*, Declaration of Frank Kendall III at 3, ECF No. 143-1. Secretary Kendall further described how the defendant's release of information regarding the provision of equipment to Ukraine "put the lives of allies and partners at risk to potential adversary attack" and "gives allies and partners pause before sharing future information, efforts and miliary planning for coordinated support to Ukraine"; he explained that "[t]ime and effort of leaders across the Department were required to restore trust and mend damaged relationships with allies and partners." *Id.* at 4. Secretary Kendall also stated that the defendant's disclosure of a document discussing a foreign adversary's plans to target U.S. forces abroad "impacts our ability to protect other military forces by providing our adversaries insight into the sources and methods we use to inform our protection of those forces." *Id.*

Similarly, in *United States v. Winner*, No. 1:17-cr-34 (S.D. Ga. 2017), the government stated unequivocally in its sentencing memorandum that "U.S. Government subject matter experts have determined" that the defendant's disclosure of an intelligence report to a news outlet "caused exceptionally grave harm to U.S. national security, which included, but was not limited to, impairing the ability of the United States to acquire foreign intelligence information similar to the information the defendant disclosed." *Winner*, Gov't Sentencing Mem. at 8 & n.7, ECF No. 320

(citing to Classified PSR Addendum that "further explain[s]" the "harm caused by the defendant's unauthorized disclosure").

Finally, in *United States v. Kiriakou*, No. 1:12-cr-127 (E.D. Va.), the government described how the defendant's conduct "caused" actual damage to national security because it led to the disclosure of the identity of a covert officer whose identity "was so closely held for two decades, that even some members of his own immediate family did not know about his association with the CIA, let alone with any particular program or operation." *Kiriakou*, Gov't Sentencing Mem. at 5, ECF No. 124; *see also Kiriakou*, Sentencing Tr. 11, ECF No. 130 ("Disclosing the identification of the covert officer threatens not only the personal safety of the officer, but it also damages and undermines the confidence in the government's ability to conduct intelligence operations and specifically to protect its intelligence officers overseas. That harm is reflected most powerfully, we would submit, in Covert Officer A's classified victim impact statement . . . . the defendant single-handedly by the disclosure that he made here betrayed Officer A's lifetime of service.").

The classified information that was available in those cases is unknown, which is the core problem with supporting sentencing recommendations based on such information. Regardless, Mr. Ellis's letter makes assertions but offers no evidence of the actual harm allegedly caused by the disclosures in this case. The government should not be permitted to make sweeping allegations of harm that are wholly unsupported in the unclassified record and claim those allegations are supported by classified information that counsel are not able to challenge and that are wholly unavailable for public inspection. The rule of law demands more. Mr. Ellis's letter does not stand up to the rigor that the Department of Justice should demand of material that it submits in connection with its pleadings, and the Court should strike it from the record and decline to consider it.

### B.      The Allegations of Concealment Are Overstated

The government's memorandum describes a series of steps that Mr. Rahman took or allegedly took to conceal his disclosures, making four arguments in support of its claims. The Court should not consider two of those arguments, which are unsupported factually. The other two arguments are derived entirely from Mr. Rahman's cooperation and therefore may not be used against him at sentencing pursuant to U.S.S.G. § 1B1.8, as discussed above.

First, the government alleges that Mr. Rahman "fortif[ied]" his Android device in order to conceal his criminal conduct, providing a handwritten checklist in support of that allegation. Gov't Mem. at 8. In fact, the Android device was "rooted" not "fortified." Rooting an Android device is a common practice of tech aficionados to personalize their app experience. The true irony here for the government is that rooting actually makes a device *more vulnerable* (i.e., not fortified) to forensic exploitation by anyone, including the FBI, for reasons explained in open source references.[6]

Second, the government argues that Mr. Rahman's deletion of reports from his work computer is grounds to support its request for an upward variance. Gov't Mem. at 9–10. As reflected in the PSR, the government informed the probation officer that "the deletions were not sufficiently related to the materials at issue in this case" to warrant an adjustment for obstruction of justice. PSR ¶¶ 42, 46. As noted above, the government had the opportunity to provide corrections to the PSR and did not provide any. This shift is another indicator that the government has unfairly changed its position at the last minute—going back on a position it affirmatively

---

[6] *See, e.g.*, *Rooting or Jailbreaking*, Nat'l Inst. of Standards & Tech., https://pages.nist.gov/mobile-threat-catalogue/stack-threats/STA-1.html ("Jailbreaking or rooting a mobile device opens security holes and circumvents the device's built-in security controls."); *Rooted Mobile Devices are 250 Times More Vulnerable*, Security Magazine (Mar. 25, 2025), https://www.securitymagazine.com/articles/101492-rooted-mobile-devices-are-250-times-more-vulnerable; *see also* Cellebrite UFED (July 2023), https://cao-94612.s3.us-west-2.amazonaws.com/documents/Cellebrite_UFED4PC_OverviewGuide_v7.66_July_2023.pdf.

shared with the probation officer—and is trying to introduce arguments that it should be precluded from making.

The government's third and fourth arguments both rely on information that Mr. Rahman provided in the course of his cooperation. Gov't Mem. at 10. These arguments are additional examples of the government's violations of U.S.S.G. § 1B1.8 by urging the Court to rely on information the government would not have known but for Mr. Rahman's early, open, and honest cooperation.

**B.      The Insinuation of a Violation of 18 U.S.C. § 794 is Unfounded and Prejudicial**

The government's memorandum claims, without support, that Mr. Rahman's actions are "akin to 18 U.S.C. § 794," citing once again to the classified submissions which do not support the statement. Gov't Mem. at 29. It is unfair to Mr. Rahman for the government to make such a loaded allegation in a public document, claiming that there is support for it in a classified submission. Defense counsel strongly disagree that there is any support for that statement and object to the unfairness of this unfounded and inflammatory claim.

**III.    The Court Should Uphold the Rule of Law**

The government's request for an upward variance is especially troubling given its efforts to support the variance by using classified information that it belatedly disclosed to defense counsel and refuses to allow Mr. Rahman himself to review, even though it purportedly relates to his own conduct. Relying on such classified information under these circumstances is not only fundamentally unfair to Mr. Rahman, but is also inconsistent with the public interest, and the need to hold the government accountable that public court proceedings provide. As the Fourth Circuit stated in *In re Washington Post Co.*, "public access [to sentencing and plea hearings] serves the important function of discouraging either the prosecutor or the court from engaging in arbitrary or

14

wrongful conduct. The presence of the public operates to check any temptation that might be felt by either the prosecutor or the court to . . . seek or impose an arbitrary or disproportionate sentence." 807 F.2d 383, 389 (4th Cir. 1986). That case was also an example of how the government uses the alleged need for secrecy to achieve unjust results. "History teaches us how easily the spectre of a threat to 'national security' may be used to justify a wide variety of repressive government actions." *Id.* at 391. *In re Washington Post Co.* is squarely on point in its criticism of exactly what the government is attempting to do in Mr. Rahman's case.

None of the points made here are intended or should be considered to undermine our initial memorandum. Mr. Rahman pled guilty to a serious offense. He profoundly regrets his conduct and is entirely remorseful. But he admits and accepts full responsibility for his offense and has undertaken extraordinary steps to assist the government with respect to mitigating and preventing future harm. He has earned, and deserves, the downward departure from the advisory Guidelines range for substantial assistance, consistent with the government's motion. He does not deserve the unfair and unprecedented upward variance that the government has belatedly requested.

\*       \*       \*

For the reasons set forth above and in the Defendant's Memorandum in Aid of Sentencing, ECF No. 70, we respectfully request that the Court impose a custodial sentence of no greater than 13 months.

Respectfully submitted,

Asif William Rahman

Date:  May 14, 2025          By:  _____

Amy Jeffress (VA Bar No. 36060)
Hecker Fink LLP
1050 K St. NW, Suite 1040
Washington, D.C. 20001
Telephone: (202) 742-2655
ajeffress@heckerfink.com


By:  _____

Deborah Curtis (admitted *pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5081
Deborah.Curtis@arnoldporter.com

*Attorneys for Defendant*

Attachments:

Exhibit A: Supplemental Declaration of William McCausland